UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF

FLORIDA, MIAMI DIVISION

Alton Earl Ingram            )

     Plaintiff              )

v.                           )

                                )          Case Number:

Stephen H. Butter, esq.     )

Stephen H. Butter, PA       )

                                )

     Defendants             )

_____/

FILED by ___ D.C.
APR 1 8 2014
STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

COMPLAINT FOR: PROFESSIONAL NEGLIGENCE / LEGAL MALPRACTICE,

FRAUD, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, INTENTIONAL

INFLICTION OF EMOTIONAL DISTRESS

COMES NOW PLAINTIFF Alton Earl Ingram and respectfully states

this complaint for Professional Negligence / Legal Malpractice,

Fraud, Breach of Fiduciary Duty, Breach of Contract, Intentional

Infliction of Emotional Distress, Demand for Punitive Damages,

and Demand for Jury Trial, and as grounds therefore states the

following:

THE PARTIES, JURISDICTION, and VENUE

1.   PLAINTIFF Alton Earl Ingram, Jr., (hereinafter "Plaintiff") is an individual who resides in Alameda County, California.

2.   DEFENDANT Stephen H. Butter (hereinafter "Defendant") is an individual who resides in Miami-Dade County, Florida.

DEFENDANT Stephen H. Butter P.A. (hereinafter "Defendant PA") is a professional association whose primary place of business is located in Miami-Dade County, Florida.

At all times relevant hereto, Defendant Butter purported to conduct business through the auspices of Defendant PA.

3.   This matter involves damages in excess of seventy-five thousand (75,000) dollars.

4.   Based on the foregoing, and in accordance with 28 U.S.C. §1332, this court has jurisdiction over the matters of and is an appropriate venue for the present action.

## FACTUAL BASIS

6. Plaintiff was divorced in Colorado in August, 2007.

7. Plaintiff, who was a full time student at the time, had represented himself in this matter, as well as a separate divorce proceeding filed in the state of Louisiana in 2006, ultimately enlisting the pro bono assistance of a Louisiana attorney in the second matter, as he could not afford an attorney.

8. In July, 2008, after having denied Plaintiff visitation as required in the Colorado stipulated divorce decree, Plaintiff's ex-wife filed a petition in family court in Broward County, Florida, seeking relief that included a restraining order preventing Plaintiff from seeing his son.

9. In November, 2008, Plaintiff's ex-wife attempted to serve Plaintiff at an address Plaintiff did not live. Although this attempt at service of process was unsuccessful, Plaintiff was notified of the attempt and sought legal advice.

10. Prior to the time that this contract was signed, Plaintiff indicated to Defendant that the only reason why he sought legal assistance at this time, rather than handling the matter on his own as before, was to prevent the issuance of a restraining order which would have prevented Plaintiff from seeing his son, and which was based on his ex-wife's complaint of false allegations of spousal abuse upon which she had based a request for a restraining order, as above.

11. At this time, Plaintiff indicated to Defendant that the sole purpose for retaining Defendant was to prevent the issuance of such a restraining order.

12. Prior to the signing of this contract, and repeatedly thereafter, Plaintiff explained to Defendant that

Plaintiff's wife had breached the Colorado Marriage Dissolution agreement in numerous, fundamental, and material manners.

13.   At this time, Defendant did not inform Plaintiff that, since the petition of the ex-wife had not been properly served, Plaintiff was under no requirement to respond to this petition and that the case therefore could be dismissed as a procedural matter at minimal expense to Plaintiff.

14.   Subsequently, Defendant represented Plaintiff in the matter, filing multiple motions, often amending said motions either with no clear purpose or necessity, and allegedly conducting extensive legal research, all of which Defendant billed Plaintiff for performing.

15.   In January, 2009, Plaintiff's ex-wife filed an amended petition, which did not include the false allegations of abuse or the request for a restraining order described above.

16.   Defendant did not inform Plaintiff that this amended petition supplanted the ex-wife's initial petition and thereby had obviated her initial attempts to obtain a restraining order against Plaintiff regarding Plaintiff's son, which was Plaintiff's sole reason for seeking Defendant's legal services.

17.     In February, 2009, Plaintiff unexpectedly and through no fault of his own lost his job, as his employer was enjoined by the Securities and Exchange Commission from continuing his business operations. Plaintiff's former employer was convicted of running a Ponzi scheme in a business separate from the firm where Plaintiff had worked.

18.     Plaintiff was never implicated in any wrongdoing in this matter but nevertheless was subject to a federal restraining order which prohibited all former employees from trading commodities pending the investigation's resolution.

19.     Plaintiff thus had lost his only source of income and immediately reported the same to Defendant.

20.     Defendant indicated to Plaintiff that if Plaintiff were unable to continue to pay his bills, Defendant would withdraw from Plaintiff's representation.

21.     Plaintiff, having discussed the matter with the attorney who had represented him on a pro bono basis in 2006, asked Defendant if it were possible in Florida for an unemployed party to obtain an order requiring the other, financially superior, party to pay for his legal fees.

22.     Defendant indicated at this time to Plaintiff that Defendant had already filed a motion requesting attorney's fees but that an order such as Plaintiff described

(requiring emergency, ongoing, or immediate payment of such fees) would be impossible to obtain.

23.    Plaintiff then requested that Defendant continue to work on the case and told Defendant that Plaintiff had arranged a loan from Plaintiff's mother, in order to pay Plaintiff's bills on an ongoing basis. Plaintiff requested that Defendant send the bills to the home address of his mother, in order to facilitate Defendant's prompt payment directly from Plaintiff's mother. Defendant complied with this request.

24.    During the months of January through November, 2009, Defendant made no meaningful attempts to ensure that Plaintiff could see his son, whose address had been hidden from him by his ex-wife for over one year.

25.    During this time, Defendant filed multiple motions which he never intended to have heard before the court and which he did not attempt to schedule for hearing before the court.

26.    In October, 2009, Defendant agreed to mediation without consulting Plaintiff, incurring additional expenses on Plaintiff's behalf without Plaintiff's permission.

27.    In December, 2009, Defendant and attorney for Plaintiff's ex-wife formulated a visitation plan which called for 3 months of supervised visitation by Plaintiff

with his son. Plaintiff told Defendant that he would not sign this document, which called for additional and ongoing expenses, if there was any reasonable possibility that the supervision would continue longer than the agreed upon three months.

28.    Defendant then assured Plaintiff that there was "no chance" that the supervision would go on more than three months, that the observers would be Plaintiff's "best witnesses" at the ultimate hearing which determined who would be the custodial parent, and that this was one rationale for Plaintiff's incurring this additional expense. Defendant never called the observers as witnesses in such a context.

29.    At the same time, Defendant told Plaintiff that Defendant would, immediately after filing the agreed visitation plan, file and schedule a motion to terminate the observation of Plaintiff's visitation with his son.

30.    Defendant did not schedule such a motion or make reasonable efforts to do so. The observation continued from December, 2009, until May, 2011, causing Plaintiff to incur additional expenses of more than ten thousand dollars.

31.    In December, 2009, for the first time since Defendant had been hired, over one year prior, Plaintiff was able to see his son. Defendant never brought Plaintiff's ex-wife's

refusal to follow a court-ordered visitation schedule to the attention of the court during that time.

32.  No later than January, 2010, Plaintiff, a licensed Doctor of Medicine, informed Defendant that Plaintiff's ex-wife was subjecting Plaintiff's son to unnecessary and dangerous medical and surgical treatment and that she had scheduled invasive surgery without consulting or informing Plaintiff.

33.  No later than January, 2010, Plaintiff informed Defendant that Plaintiff's ex-wife was subjecting Plaintiff's son to unnecessary psychological counseling, which was being given by unqualified individuals in the context of a battered women's shelter. Defendant stated to Plaintiff that such counseling likely was harmful psychologically to Plaintiff's son yet did nothing to evaluate or to remedy the situation.

34.  No later than January, 2010, Plaintiff informed Defendant that Plaintiff's ex-wife likely suffered from Munchausen's Syndrome by Proxy, a mental illness that subjected Plaintiff's son to an approximately 10% chance of death by the age of 18 if not treated.

35.  Defendant filed a motion to prevent Plaintiff's ex-wife from subjecting Plaintiff's son to such potentially

dangerous medical treatments without consulting Plaintiff, but Defendant did not schedule a hearing on the matter.

36.     In February, 2010, Defendant finally filed a motion to modify the above temporary visitation order, but Defendant never scheduled this motion for hearing, thus subjecting Plaintiff to ongoing expenses for over one year more than Plaintiff had agreed to incur them.

37.     In February, 2010, Defendant, without consulting Plaintiff, filed a motion for mediation. This motion was granted and subjected Plaintiff to expenses (travel, attorney's fees, mediator's fees).

38.     In February, 2010, Defendant filed a motion for a restraining order preventing Plaintiff's ex-wife from making medical decisions regarding Plaintiff's son without Plaintiff's being consulted. Defendant never scheduled this matter for hearing, never took discovery, and never investigated the matter adequately.

39.     In March, 2010, Defendant filed a motion to compel discovery of Plaintiff's ex-wife. Defendant never followed through with obtaining the discovery so sought but nevertheless charged Plaintiff for the costs of preparing and filing this motion.

40.    In March, 2010, Defendant agreed, without Plaintiff's consent or consultation, to an order agreeing to produce certain items to Plaintiff's ex-wife.

41.    In March or April, 2010, Plaintiff's ex-wife's attorney authored an authorization request for information putatively based on the above agreed on discovery order. This request included more information than required by the above court order.

42.    Plaintiff pointed this out to Defendant, who had not noticed the discrepancy, and produced an alternate authorization with Plaintiff's signature. Defendant indicated that signing the over-inclusive authorization would be in Plaintiff's best interest and advised Plaintiff to do so.

43.    Plaintiff followed Defendant's legal advice, resulting in the production of information which was not required by the court order and which was used against Plaintiff, to Plaintiff's detriment, at the May, 2011 hearing.

44.    In March, 2010, Defendant agreed, without Plaintiff's consent or consultation, to an order deferring Plaintiff's ex-wife's motion for a money judgment.

45.    In March, 2010, Defendant filed an amended motion for a restraining order preventing Plaintiff's ex-wife from making medical decisions regarding Plaintiff's son without

Plaintiff's being consulted. Defendant never scheduled this matter for hearing, never took discovery, and never investigated the matter adequately.

46.    Defendant did not base this amended motion for restraining order on any information that was not available to him at the time that the original motion for restraining order was filed. Filing the amended motion caused Plaintiff to incur additional costs.

47.    In March, 2010, Defendant filed a motion to compel Plaintiff's ex-wife's participation in mediation without consulting with Plaintiff or obtaining Plaintiff's permission to do so.

48.    Plaintiff did not at the time wish to undergo any further mediation because of the cost and the clear lack of good faith negotiation in prior mediation and settlement conferences. Plaintiff's ex-wife ultimately refused to participate in the mediation, which had required Plaintiff's presence 800 miles from his home and which had resulted in Plaintiff's having to pay attorney's fees and fees for the mediator.

49.    In April, 2010, Plaintiff drove 800 miles to participate in court ordered visitation with his son. Plaintiff's drop off location. Defendant was immediately notified of this fact.

50.    Defendant filed an emergency motion for contempt regarding this failure to follow a court order and scheduled a hearing.

51.    Defendant never properly brought this matter to the court's attention, and no final order was ever entered on this emergency motion.

52.    Defendant also scheduled a deposition of Plaintiff's ex-wife regarding this matter, to be conducted prior to the scheduled hearing.

53.    Defendant indicated to Plaintiff that Plaintiff's ex-wife likely had refused to produce Plaintiff's son under the instructions of her attorney and that Defendant intended to question Plaintiff's ex-wife about this matter both in deposition and before the court.

54.    Defendant indicated to Plaintiff that if Plaintiff's ex-wife's failure to follow a court order were demonstrated to the court, this would have a very beneficial effect on Plaintiff's attempts to be able to spend a meaningful amount of time with his son and would lead to the ex-wife's having to pay Plaintiff's expenses for the trip and for attorney's fees.

55.    Defendant indicated to Plaintiff that if Plaintiff's ex-wife's failure to follow a court order were imputed to her attorney, that sanctions against Plaintiff's ex-wife

and/or her attorney could be obtained. Defendant indicated
that these sanctions could include money damages to
Plaintiff as well as procedural rulings that would benefit
Plaintiff greatly in the ongoing litigation.

56.    Plaintiff asked that Defendant ascertain the
whereabouts of Plaintiff's son, and Defendant indicated
that it would be impossible to do so prior to the upcoming
court hearing.

57.    In April, 2010, while all of the above matters were
happening in rapid succession, Plaintiff informed Defendant
that Plaintiff, because of the additional expenses of
visitation observers, no longer could borrow money for the
payment of legal fees.

58.    Plaintiff requested that Defendant allow Plaintiff
access to his legal records in order to represent himself
in the pending matters before the court.

59.    Defendant indicated to Plaintiff that, as Plaintiff's
account was in arrears, Defendant was under no legal
obligation to allow such access and that Defendant would
not do so.

60.    Defendant further indicated to Plaintiff that if
Plaintiff did not have the representation of an attorney in
the ongoing matters, it was Defendant's expert legal
opinion that Plaintiff would never see his son again.

61.     Defendant further indicated that if Plaintiff were to attempt to engage the services of another attorney at a reduced rate, Defendant would not share his files with such attorney, since all of the important documents were matters of public record and because Defendant was under no obligation to do so because Plaintiff's account was in arrears.

62.     At the time, Plaintiff's account actually was not in arrears, since Defendant had, on an ongoing basis, overcharged Plaintiff, and because the payments to Defendant had exceeded the amount of money actually owed under the hourly agreement entered into in December, 2008.

63.     Based on this representation, Plaintiff arranged to borrow additional funds to pay Defendant and entered into a second contract with Defendant for legal services, which was memorialized in a letter from Plaintiff to Defendant (EXHIBIT B).

64.     In May, 2010, after receiving Plaintiff's lump sum payment, Defendant filed a motion with the court requesting an order directing compliance with the court's order and for sanctions.

65.     Defendant never properly brought this matter to the court's attention, and no final order was ever entered on this motion.

66.     In May, 2010, Defendant indicated to Plaintiff that
certain actions taken by counsel for Plaintiff's ex-wife
violated the law in that they were attempts to influence
the testimony of Henry Palm and Pamela Sullivan, the two
visitation observers whose testimony Defendant told
Plaintiff would greatly enhance Plaintiff's chances of
guaranteeing ongoing significant visitation with his son
effecting a change in the primary parent.

67.     In May, 2010, Plaintiff's ex-wife's attorney sought to
schedule a deposition of Plaintiff 800 miles from
Plaintiff's home. Defendant agreed to this deposition
despite the fact that it was financially and logistically
burdensome on Plaintiff and not required of Plaintiff,
since Plaintiff already had been deposed by his ex-wife's
attorney at a deposition which was called short by
Plaintiff's ex-wife's attorney because of a social
engagement.

68.     In May, 2010, Defendant scheduled a deposition of
Plaintiff's ex-wife approximately two hours prior to the
scheduled hearing on the above matters. Almost immediately
after the beginning of the deposition, Defendant left the
room, whereupon Plaintiff's ex-wife's attorney called off
the deposition, making it impossible for Plaintiff to
obtain any discovery prior to the scheduled hearing.

69.    On the same day, a hearing was held before the court. In this hearing, under oath, Plaintiff's ex-wife's attorney stated that Plaintiff had committed homicide, which was a false statement to the court, and made various other defamatory statements regarding Plaintiff.

70.    This hearing resulted in Plaintiff's not being granted summer visitation with his son at Plaintiff's home during 2010, despite the fact that no reason existed for the denial of such visitation.

71.    Defendant did not adequately represent Plaintiff at this hearing, in part due to his failure to have conducted adequate pre-hearing discovery.

72.    In June, July, and August, 2010, Plaintiff's ex-wife refused to produce Plaintiff's son for visitation as ordered by the court.

73.    Defendant, no longer working for an hourly fee, now took no actions to ascertain the whereabouts of Plaintiff's son, to enforce the visitation order, or to seek sanctions against Plaintiff's ex-wife or Plaintiff's ex-wife's attorney. Instead, he filed a notice of absence with the court.

74.    In August, 2010, Defendant, against Plaintiff's direct instructions, filed a motion with the court to appoint a guardian ad litem.

75.     This motion eventually was granted by the court, in a
hearing which was scheduled at a time when Defendant knew
that Plaintiff would not be in the area and could not
attend to voice his objection to his own attorney's motion.

76.     The order granting this motion included a provision
that Plaintiff, who was unemployed, pay 80% of the
guardian's fees. The court did not hear any testimony
regarding the parties' abilities to pay, since Defendant
had arranged the hearing to occur while Plaintiff was out
of state and unavailable and did not arrange for Plaintiff
to appear telephonically.

77.     Defendant never communicated this requirement to
Plaintiff except by sending Plaintiff a copy of the court's
order.

78.     Upon receiving a copy of the court order, Plaintiff
immediately contacted Defendant and indicated his inability
to pay these unknown additional expenses, whereupon
Defendant indicated that if Plaintiff did not comply with
the court's order, Plaintiff would be jailed until any fees
incurred by the guardian were paid.

79.     This motion resulted in Plaintiff's incurring over ten
thousand dollars of additional costs.

80.     In September, 2010, Plaintiff's ex-wife engaged the
services of an attorney whom Plaintiff previously had

consulted regarding a matter which was materially related to the ongoing proceedings.

81.    Plaintiff immediately instructed Defendant to request that this attorney, his firm, and all attorneys then working at his firm be precluded from representing Plaintiff's ex-wife. Defendant repeatedly refused to do so or to contact said attorney to point out the conflict.

82.    In October, 2010, after Plaintiff's repeated requests, Defendant finally filed a motion to disqualify said attorney from representing Plaintiff's ex-wife.

83.    In October, 2010, Defendant represented to Plaintiff that it was in Plaintiff's best interest to withdraw the above motion, since doing so would ensure that Plaintiff could have a final hearing on visitation with his son in December, 2010.

84.    Plaintiff took Defendant's advice and withdrew his motion to disqualify his prior attorney. Despite this fact, no hearing was held in December, 2010.

85.    At that time, Plaintiff instructed Defendant to seek disqualification of Plaintiff's prior attorney and all members of his firm. Defendant refused to do so.

86.    In December, 2010, after Plaintiff's repeated requests to do so Defendant filed a motion for make up visitation, contempt of court, attorney's fees, and other relief.

87.    Defendant never scheduled a hearing on any of the above matters with the court.

88.    In December, 2010, on the order of the guardian ad litem, Plaintiff and Plaintiff's ex-wife were required to undergo an evaluation by a licensed psychologist.

89.    This evaluation revealed that the psychologist felt it likely that Plaintiff's ex-wife suffered from Munchausen's Syndrome by Proxy and that Plaintiff's ex-wife should undergo further psychological evaluation in order to protect Plaintiff's son from this danger.

90.    During a meeting at the psychologist's office, in the presence of the psychologist, Plaintiff, and Defendant, the guardian ad litem characterized Plaintiff's ex-wife's behavior toward Plaintiff's son as "like a mother lion protecting its cub."

91.    This characterization is consistent with the pathology underlying Munchausen's Syndrome by Proxy, as urged by Plaintiff and the court appointed psychologist.

92.    Despite Plaintiff's repeated entreaties, neither Defendant nor the guardian ad litem sought in any way to obtain the recommended psychological evaluation of Plaintiff's ex-wife.

93.    Despite Plaintiff's repeated entreaties, Defendant refused to urge the guardian ad litem to seek in any way to

obtain the recommended psychological evaluation of
Plaintiff's ex-wife.

94.    In December, 2010, Plaintiff discovered that his ex-
wife's boyfriend, who upon information and belief
frequently spent time alone with Plaintiff's then five year
old son, had been made the subject of a restraining order
because he had threatened his ex-wife and daughter and had
threatened to mutilate a third party's genitals.

95.    Plaintiff immediately informed Defendant of these
facts after obtaining copies of the restraining order and
associated court filings.

96.    Defendant contacted the third party who had been
threatened with genital mutilation. Defendant informed
Plaintiff that this party was willing to testify as to his
assailant's history of violence, mental illness, and
threatening statements.

97.    Plaintiff obtained online information which indicated
that his ex-wife's married boyfriend had been involved in a
number of other incidents which had led to the issuance of
restraining orders and forwarded to Defendant the
information needed to obtain these records at the Dade
County Courthouse.

98.    Defendant informed Plaintiff in person that this third
party would become Plaintiff's "new best friend," since

this third party's testimony would greatly impact Plaintiff's ability to prevail on his motion to become the primary custodial parent of his son and could be used as leverage in any negotiations with Plaintiff's ex-wife.

99.    Despite the foregoing, Defendant refused Plaintiff's repeated requests to file any papers informing the court of these matters or seeking to limit the exposure of Plaintiff's son to his ex-wife's married boyfriend.

100.    Despite the foregoing, Defendant refused personally to bring the above matters to the attention of the guardian ad litem, informing Plaintiff that Defendant "had better ways to spend his time" and that if Defendant wanted to communicate any concerns to the guardian, Plaintiff could do so on his own, without any assistance of counsel.

101.    Plaintiff was informed on or about January, 2011, by his son, that his ex-wife's boyfriend's son, who was approximately 15 years old at the time, had repeatedly physically and verbally "bullied" Plaintiff's son, while in the presence of Plaintiff's ex-wife's boyfriend.

102.    Plaintiff, a licensed physician, examined his son. He found evidence of numerous small contusions on his son's body, which were consistent with the child's allegations of physical abuse.

103.    Plaintiff immediately informed Defendant via
telephone, requesting that Defendant immediately file
whatever court papers were necessary to insure that his son
not be exposed to any further abuse, and requesting that
Defendant take whatever steps were necessary on an
emergency basis to allow Plaintiff not to return his son to
his ex-wife that night, pending the emplacement of adequate
evaluation of these allegations of abuse.

104.    Defendant refused to do so and refused to contact the
guardian ad litem with Plaintiff's new information.

105.    When Plaintiff was unable to reach the guardian ad
litem, on a Sunday afternoon, Plaintiff asked Defendant
what if anything Plaintiff could legally do in order to
protect his son from the reported abuse.

106.    Defendant informed Plaintiff that there was nothing
that Plaintiff could do, that if Plaintiff failed to drop
off his son at the designated exchange place and time,
Plaintiff likely would be arrested, and that then "all hell
would break loose and [Plaintiff] would never see [his] son
again."

107.    In approximately January, 2011, Plaintiff's ex-wife's
boyfriend assaulted Plaintiff's then 75 year old mother
during an exchange of Plaintiff's son in the parking lot of
the Marriott on US1 and Commercial Blvd in Fort Lauderdale.

Plaintiff and plaintiff's son were present and witnessed the event.

108.    Plaintiff again immediately informed Defendant, requesting that Defendant take proper action with the court and vis-à-vis the guardian ad litem in order to protect his mother's safety.

109.    Defendant informed Plaintiff that taking such action was not within the purview of Defendant's representation of Plaintiff and refused to take any action or to inform the guardian or the court of this occurrence.

110.    In approximately late January or early February, 2011, Plaintiff's ex-wife's boyfriend committed battery of Plaintiff, while Plaintiff sitting on a bench with his son in his lap in the presence of three witnesses immediately after a scheduled pick up of his son at Holiday Park in Fort Lauderdale.

111.    As soon as there was no threat of further violence, Plaintiff called Defendant and reported these matters to Defendant.

112.    Plaintiff again requested that Defendant take proper action with the court and vis-à-vis the guardian ad litem in order to protect his child's, his own, and his mother's safety.

113.   Defendant again refused to seek any relief from the court or to discuss the matter with the guardian ad litem, again asserting that doing so was not part of Plaintiff's agreement with Defendant regarding representation.

114.   Defendant also advised Plaintiff not to call the police at that time, since doing so would result in Plaintiff's son's becoming "more fucked up than he already is going to be."

115.   Plaintiff requested that Defendant assist Plaintiff with obtaining a restraining order against his assailant, and when Defendant refused to do so, Plaintiff proceeded with obtaining a temporary restraining order against his assailant without the assistance of Defendant.

116.   The emergency petition for restraining order was granted by the court, and a hearing was scheduled in order to convert the temporary restraining order to a permanent restraining order.

117.   Plaintiff reiterated his request for assistance from Defendant regarding the required hearing, and Defendant refused to give Plaintiff any assistance.

118.   Two court hearings were held regarding the above restraining order. The order ultimately was dismissed because when filling out his amended petition, Plaintiff had not properly referred to his initial petition, and

therefore the amended petition did not properly allege all
of the facts.

119.    Plaintiff was not aware of the technical distinction
between an amended petition and an amendment to a petition.
It is this distinction, one which any attorney with
Defendant's claimed level of expertise in family law, which
led to the technical deficiency of Plaintiff's petition.

120.    On the date of the court hearing regarding the
restraining order, the guardian ad litem appeared in the
hallway to the courtroom in the company of opposing
counsel. Plaintiff determined that the guardian had come to
court in the company of opposing counsel and had spoken
with counsel for Plaintiff's assailant prior to the
hearing.

121.    Plaintiff reported the occurrences in court to
Defendant and asked Defendant if he believed that such
contact was appropriate. Defendant replied that it
"probably wasn't" but refused despite Plaintiff's repeated
requests to take any action to ensure that the guardian ad
litem was behaving solely in the interest of Plaintiff's
minor child.

122.    Defendant indicated to Plaintiff that it was
Defendant's belief that, because Plaintiff had contacted
the guardian ad litem too frequently regarding the matter

of his son's bullying and regarding "trivial" matters
regarding Plaintiff's ex-wife's ongoing and frequent
refusal to abide by the details of the parenting plan, the
guardian ad litem "favored" Plaintiff's ex-wife.

123.    Plaintiff asked Defendant to investigate his beliefs
and to bring them to the attention of the court. Defendant
refused to do either.

124.    During the pendency of the above restraining order
proceedings, Plaintiff obtained a restraining order from
the family court with jurisdiction over the postdissolution
proceedings, prohibiting Plaintiff's ex-wife from making an
exchange of Plaintiff's son when Plaintiff's assailant was
nearby.

125.    Plaintiff's ex-wife violated this court order.

126.    Plaintiff immediately brought this violation to
Defendant's attention and requested that Defendant file
papers to hold Plaintiff's ex-wife in contempt of the court
order.

127.    Defendant refused to do so.

128.    When Plaintiff pressed Defendant and informed
Defendant that Plaintiff intended to file papers seeking
contempt and sanctions against his ex-wife, Defendant
threatened to withdraw from Plaintiff's representation and

indicated that he would not refund Plaintiff's prepayment of legal fees.

129.   At some point in time, unknown to Plaintiff because Defendant did not consult with or obtain the permission of Plaintiff, Defendant entered into an agreement with opposing counsel not to investigate the financial wherewithal of either Plaintiff's or Plaintiff's wife's mother.

130.   Plaintiff's ex-wife's mother had given, on an ongoing and recurrent basis for more than a decade, substantial financial assistance to Plaintiff's ex-wife.

131.   During the period when Plaintiff was represented by Defendant in the postdissolution matters, the support which Plaintiff's ex-wife received from her mother exceeded the income she represented as having received from all sources in papers filed with the court.

132.   Defendant's agreement to "keep the grandmothers out of it" was contrary to Plaintiff's direct instructions and to Defendant's repeated representations to Plaintiff.

133.   When, in approximately February, 2011, Defendant informed Plaintiff of this agreement, Plaintiff reiterated that he did not consent to any limitation of discovery and instructed Defendant to proceed with discovery as previously agreed on by Plaintiff and Defendant.

134.    Defendant refused to do so.

135.    Later in the Spring, just prior to the final hearing
  in the matter, opposing counsel subpoenaed Plaintiff's
  mother to testify at the hearing, ultimately questioning
  her entirely regarding her financial support of Plaintiff
  subsequent to his divorce.

136.    Upon learning of this subpoena, Plaintiff requested
  that Defendant seek to prevent such questioning, that he
  conduct adequate discovery of Plaintiff's ex-wife's
  finances, that he point out opposing counsel's duplicitous
  conduct to the court, and that he seek sanctions against
  Plaintiff's ex-wife and/or opposing counsel.

137.    Defendant refused to follow Plaintiff's instructions
  or to explain why he believed that doing so would be
  against Plaintiff's best interests.


138.    "Final hearings" were scheduled four times during
  Defendant's representation of Plaintiff.

139.    Regarding the first three of these scheduled hearings,
  the first of which was held but continued in part, and the
  last two of which were continued, Defendant did not prepare
  Plaintiff in any manner for Plaintiff's anticipated
  testimony, did not go over the evidence which Defendant

anticipated presenting or the evidence which Defendant anticipated that opposing counsel would present.

140.    Defendant was utterly unprepared to conduct any of these scheduled hearings, in dereliction of his contractual and professional duties to Plaintiff.

141.    As a result of his lack of preparation, Defendant agreed with opposing counsel to continue the first and second hearings, to Plaintiff's detriment.

142.    During April, 2011, Defendant, without consulting Plaintiff, arranged for a mediation to take place in the offices of the guardian ad litem.

143.    Plaintiff immediately informed Defendant that this appeared to be unethical, given the guardian's role, and that Plaintiff did not wish to participate in any such mediation, especially if it involved anything other than the parenting plan.

144.    Defendant informed Plaintiff that the mediation, for which Plaintiff ultimately was billed hundreds of dollars, already had been scheduled, and that if Plaintiff did not attend, Defendant would do so in Plaintiff's absence, that such an occurrence likely would prejudice the guardian against Plaintiff in the guardian's ultimate report, and that the mediation could be limited to issues of visitation.

145.    Plaintiff attended the mediation under duress, as
        above.

146.    A large portion of the mediation consisted of opposing
        counsel and Plaintiff's ex-wife going over financial
        information with the guardian outside the presence of
        Plaintiff or Defendant.

147.    This information, which had been obtained by the
        overly broad release of financial information which
        Plaintiff had signed at Defendant's urging, had been
        available to Defendant, but Defendant had refused to
        examine it.

148.    At this time, Plaintiff instructed Defendant to obtain
        a copy of this information, and Defendant did not do so
        until one day prior to the hearing.

149.    This mediation did not result in an enforceable
        agreement but merely added expense to Plaintiff and allowed
        opposing counsel an opportunity to discuss with the
        guardian ad litem information which was derogatory to
        Plaintiff but irrelevant to the guardian's duties.

150.    Regarding the fourth scheduled "final hearing," which
        was scheduled to take place one day after the above
        mentioned settlement conference held among Defendant,
        opposing counsel, and the guardian ad litem, Defendant

again failed to prepare either himself, Plaintiff, or Plaintiff's mother, who had been subpoenaed to testify.

151.    In the weeks leading up to this hearing, Plaintiff repeatedly contacted Defendant over the telephone, email, US mail, and certified US mail, in order to clarify the legal strategy and to schedule a time for trial preparation.

152.    Defendant ignored these requests, refused to discuss the legal strategy with Plaintiff, and refused to schedule an appointment for trial preparation until one day prior to the hearing.

153.    Defendant met with Plaintiff on the afternoon of the day before the fourth scheduled "final hearing" at Defendant's office.

154.    At that time, Defendant described to Plaintiff the events that occurred during a meeting among Defendant, opposing counsel, and the guardian ad litem.

155.    At that time, Defendant informed Plaintiff that an agreement had been reached among the attorneys, that the next day's hearing would be limited in scope to just the parenting plan and child support issues, and that no other matter which was then pending before the court would be heard.

156.    At that time, Defendant presented Plaintiff with a
parenting plan which Defendant stated he had agreed upon
with opposing counsel, without Plaintiff's consent.

157.    Defendant requested that Plaintiff read and sign the
agreement.

158.    Plaintiff read the parenting plan, which had been
composed by opposing counsel, and was confused as to the
meaning of the first paragraphs. Plaintiff asked Defendant
to explain the precise meaning of those paragraphs, and
Defendant could not.

159.    Plaintiff read the remainder of the parenting plan and
unequivocally expressed to Defendant that Plaintiff did not
agree with the terms.

160.    This parenting plan actually decreased Plaintiff's
parenting time with his son, did not allow the usual more
than half amount of summer visiting time with the
nonresidential parent that is the norm in Florida, and
called for a halt to any visitation outside the Fort
Lauderdale area in the event that Plaintiff moved from Gulf
Shores, Alabama.

161.    Plaintiff had already informed Defendant of his
impending plans to move from Gulf Shores Alabama and
reminded Defendant of same.

162.    Plaintiff refused to sign the document, which already contained Plaintiff's ex-wife's signature, and instructed Defendant to notify opposing counsel and the guardian ad litem of Plaintiff's rejection of the putative agreement.

163.    Approximately 30 minutes after the beginning of the scheduled meeting, Defendant spoke on the telephone to opposing counsel in Plaintiff's presence.

164.    Defendant did not clearly express Plaintiff's rejection of the parenting plan's terms but merely indicated to opposing counsel that Plaintiff was "being an asshole" but that Defendant would ensure that Plaintiff would "come around."

165.    At that point, Plaintiff asked Defendant if the guardian ad litem had prepared a written report for presentation to the court, as required by law.

166.    Defendant replied that the guardian ad litem had not done so.

167.    Plaintiff requested that Defendant either seek a continuance of the hearing scheduled for the next day or seek to exclude the acceptance into evidence of a verbal guardian ad litem's "report" on this basis.

168.    Defendant stated during this meeting that he was "sick of this fucking case" and that he did not intend to follow Plaintiff's instructions.

169.    Defendant stated during this meeting that he would allow Plaintiff to make a statement to the court if Plaintiff "felt [he] had to."

170.    Plaintiff also reiterated his request that Defendant present to the court Defendant's misgivings concerning the guardian ad litem's partiality toward Plaintiff's ex-wife. Defendant stated that he would not present any such testimony.

171.    Defendant stated during this meeting that the guardian ad litem had indicated to Defendant that both Plaintiff were "shitty parents" but that Plaintiff was a "shittier parent" than his ex-wife.

172.    The guardian ad litem later denied in writing to Plaintiff that he ever made such a statement.

173.    Defendant did not follow Plaintiff's instructions regarding the guardian ad litem, nor did he explain how doing so would not have served Plaintiff's interests.

174.    Plaintiff then reiterated his prior request to Defendant, that Defendant present to the court evidence of the fraudulent and coercive manner in which Plaintiff's ex-wife had obtained Plaintiff's signature on the Colorado divorce stipulation.

175.    Plaintiff pointed out to Defendant inconsistencies between the Colorado stipulation and the transcript of the

agreement between Plaintiff and Plaintiff's ex-wife,
referring to emails and a transcript which Plaintiff had
provided to Defendant over one year prior.

176.   Defendant informed Plaintiff that the
misrepresentations and coercive tactics indicated therein
were not relevant in a family court.

177.   Defendant informed Plaintiff that if Plaintiff wished
to rescind the terms of his divorce stipulation, Plaintiff
would have to attempt to do so in a "civil court," since
the stipulation was a contract.

178.   At this point, approximately 45 minutes after the
meeting had begun, and prior to either preparing either
witness in any manner or going over the discovery evidence
which Defendant claimed his office had only received from
opposing counsel approximately one week prior, Defendant
indicated to Plaintiff that Defendant had to leave the
office, as he had a tennis match.

179.   Plaintiff asked Defendant to stay in the office, to go
over the newly presented evidence and to prepare him for
the hearing scheduled for the next day.

180.   Defendant refused to do so but informed Plaintiff that
Plaintiff could have access to Plaintiff's files, which
Defendant indicated were in Defendant's copy room.

181.    Defendant also indicated for the first time during this meeting that he had agreed, as a precondition to Plaintiff's having out of state visitation with his son, that Plaintiff would have the first overnight visitation with his son that Defendant had been able to arrange in the two and one half years that he had represented Plaintiff, the night prior to the scheduled hearing and that Plaintiff needed to pick up his son in Fort Lauderdale approximately three hours after the start of the pre-trial meeting in order for this visitation to take place.

182.    Plaintiff requested that Defendant seek to reschedule this visitation, so that Plaintiff could adequately prepare for the next day's hearing.

183.    Defendant refused to do so, stating that the overnight visit that night had been agreed upon and was an absolute prerequisite to Plaintiff's being able to spend any overnight visits with his son over the upcoming summer.

184.    Defendant stated "If you ever want to see your son outside the state of Florida, you'd better not be late to this pickup."

185.    Whereupon Defendant left the office.

186.    Defendant's files on Plaintiff's case were in a state of disarray which was inconsistent with the prevailing professional standard for the maintenance of such records.

187.   The next day, on the morning of the final hearing regarding the above matters, Plaintiff's mother, who had been subpoenaed to testify, suffered an episode of acute cerebral ischemia / atypical migraine headache.

188.   Plaintiff attempted to contact his mother's neurologist but was unable to do so because of the difference in time zone.

189.   Plaintiff contacted two other physicians and explained the situation to them. Each of these physicians indicated that Plaintiff's mother should not testify in court in her condition.

190.   Plaintiff informed Defendant of his mother's condition, of his attempts to contact her neurologist, and of the advice of the other two physicians.

191.   Defendant informed Plaintiff that if Plaintiff's mother did not testify in court that morning as ordered, she would be held in contempt and put in jail.

192.   Plaintiff's mother's condition worsened prior to her testimony, which was held up because Plaintiff's ex-wife was almost one hour late to court.

193.   During her testimony, in presence of Plaintiff, Plaintiff's mother's condition worsened to the extent that she was blind in one eye, and she ultimately suffered a stroke.

194.    Eventually, Plaintiff's mother's testimony was terminated. Plaintiff took his mother outside and told her that she should go to the hospital.

195.    Plaintiff's mother refused to do so unless accompanied by Plaintiff, as her husband had died in a hospital less than two years earlier due to the negligence of a nurse.

196.    Plaintiff spoke to Defendant and asked that he be allowed to accompany his mother to the hospital, in the hope that he could return first thing in the afternoon.

197.    Defendant refused to request such an accommodation from the court and informed Plaintiff that if Plaintiff attempted to leave the courthouse, he likely would be jailed for contempt of court.

198.    Plaintiff arranged for his mother to leave the courthouse and, in an extremely agitated state of mind, returned to testify.

199.    Plaintiff's mother's actually did suffer a stroke on the morning of the hearing, which Plaintiff witnessed.

200.    Upon returning to the courtroom, Plaintiff was required to testify under oath. Because of his extreme emotional distress, having just witnessed his only surviving parent suffer a stroke, Plaintiff was not as effective or credible a witness as he would have been under normal conditions.

201.    During this hearing, Defendant:

    a. Refused to introduce evidence regarding the formation of the Colorado Divorce stipulation which Plaintiff repeatedly had requested be introduced,

    b. Did not present evidence of Plaintiff's ex-wife's material breach of said stipulation,

    c. Did not present evidence of Plaintiff's ex-wife's finances,

    d. Did not present all possible and reasonable legal theories as to why Colorado stipulation was invalid,

    e. Did not present all relevant evidence of the material change in Plaintiff's financial position since the signing of the Colorado stipulation,

    f. Did not present expert testimony regarding the job market in Gulf Shores, AL, Plaintiff's current home, in the light of the global financial meltdown of 2008 and the BP oil spill in the Gulf of Mexico in 2009,

    g. Did not properly object to the introduction of evidence referring to a Wells Fargo Bank Account, which Defendant had claimed should have been excluded because Defendant was not presented with said information in the required pre-trial timeframe,

    h. Did not preserve numerous objections for appeal,

i. Did not seek to exclude the guardian ad litem's testimony because no report had been prepared as required by law,

j. Actively participated in the representation to the court of the parenting plan which Plaintiff had refused to endorse one day earlier as a jointly-agreed-upon plan,

k. Refused, despite Plaintiff's direct instructions, to introduce evidence regarding Plaintiff's and Plaintiff's mother's financial situation,

l. Did not present evidence of the ex-wife's having hidden Plaintiff's child from him in the past,

m. Did not present evidence of the ex-wife's having violated orders of the court hearing the case as regards visitation,

n. Did not present evidence of the fact that the ex-wife had fraudulently obtained a passport for Plaintiff's child,

o. Did not present evidence that the guardian ad litem had not followed the psychologist's recommendations regarding the evaluation of Plaintiff's ex-wife for Munchausen's Syndrome by Proxy,

p. Stipulated to the submission into evidence of an accounting of Plaintiff's payments of spousal support

by opposing counsel which Defendant had reason to know
was incorrect and which Plaintiff at the time
indicated to Defendant was incorrect,

q. Agreed with opposing counsel to postpone the issue of
determining attorneys' fees until an unspecified time
in the future,

r. And in other manners failed to act with reasonable
care and diligence or to maintain the standard that
any reasonable attorney would have maintained under
like circumstances.

202.    At the end of the hearing, the court:

a. found the Colorado divorce stipulation enforceable as
to spousal support,

b. imputed income to Plaintiff,

c. modified the parenting plan to reflect largely the
plan which had been presented as a joint plan,

d. awarded Plaintiff's ex-wife attorney's fees, and

e. ruled that Plaintiff was entitled to attorney's fees
as regarded the enforcement of visitation, but ruled
that Plaintiff's ex-wife was unable to pay, based upon
the evidence presented.

203.    Defendant failed to explain to Plaintiff any of
Plaintiff's rights regarding requesting reconsideration of
the ruling, the process whereby a final order would be

composed, or the appellate process, despite Plaintiff's
request that Defendant do so.

204.    Plaintiff instructed Defendant in writing to inform
Plaintiff of each step in the process of the court's
formulating a final order.

205.    Defendant refused to do so.

206.    The court eventually entered a final order in the
case, which Defendant indicated to Plaintiff was not an
accurate representation of the court's ruling.

207.    Plaintiff, having researched the procedure, instructed
Defendant to file a motion for reconsideration, which
Plaintiff requested be based on numerous specific facts
surrounding the case.

208.    Defendant filed a perfunctory motion for
reconsideration which did not include or reflect the facts
which Plaintiff had requested be included.

209.    The court denied Defendant's motion for
reconsideration.

210.    Plaintiff attempted to contact Defendant regarding the
preparation of an appeal of the final order as well as to
formulate a plan regarding the litigation of numerous
matters which were pending before the court as of that
date.

211.    Defendant refused to discuss any of the above with Plaintiff.

212.    Instead, Defendant requested that the court allow him to withdraw from Plaintiff's representation, without properly noticing Plaintiff of the hearing that Defendant had scheduled on a date when Defendant knew Plaintiff would be unable to travel to the site of the hearing.

213.    Defendant appeared at the hearing in Plaintiff's absence, and without apprising the court of Defendant's ongoing contractual obligation to Plaintiff, secured an order of court regarding his motion to withdraw from Plaintiff's representation.

214.    Subsequent to this withdrawal from representation, Plaintiff represented himself in the matter.

215.    Plaintiff repeatedly requested that Defendant allow him to copy his legal record.

216.    Defendant refused until Plaintiff contacted the Florida Bar for assistance.

217.    Thereupon, Defendant gave Plaintiff an opportunity to copy his legal files.

218.    At that time, Defendant discovered that the files were incomplete and that they were missing:

    a. a number of letters, faxes, and emails that Plaintiff had sent Defendant,

b. the discovery authorization that Plaintiff had given Defendant in or about April, 2010,

c. notes of numerous conversations between Plaintiff and Defendant,

d. discovery regarding Plaintiff's ex-wife,

e. true copies of the two contracts which are attached to this petition as exhibits A and B,

f. and many other items which should have been in the files, had Defendant properly maintained a record, in accordance with the appropriate professional standard of care.

219. The matter of attorneys' fees has been resolved in favor of Plaintiff's ex-wife in the full amount which she claimed against Plaintiff.

220. This resolution occurred after at least four hearings were held on the matter.

221. At the first and second of these hearings, scheduled for two hours, counsel for Plaintiff's ex-wife did not bring admissible evidence which supported the amount of damages which were requested or which ultimately were awarded.

222. Plaintiff was not represented by an attorney at this hearing.

223.   After having his ex-wife's putative evidence held inadmissible, Plaintiff made a procedural mistake which allowed opposing counsel to get this evidence admitted at a later hearing, which would not have occurred had Plaintiff not made said procedural mistake.

224.   No competent attorney would have made the procedural mistake that Plaintiff made.

225.   Regarding the hearings for attorneys' fees, Plaintiff notified Defendant of each hearing and requested that Defendant represent Plaintiff in these hearings as he was contractually obligated to do.

226.   In addition, Plaintiff asked that Defendant make himself available as a witness to rebut the reasonableness of Plaintiff's ex-wife's claimed attorneys' fees.

227.   Defendant refused to do either.

228.   At the last of these four hearings, based purely on procedural grounds, the court granted Plaintiff's ex-wife's motion to set attorneys' fees in the full amount requested.

229.   Had Plaintiff had competent legal representation at the hearing, the amount awarded would have been less than that actually awarded, since there was a legal basis for the exclusion of at least some of the evidence upon which the determination was made.

230.    Subsequent to and as a direct and proximate result of
   Defendant's withdrawal from Plaintiff's representation,
   Plaintiff's ability to prosecute his case has been severely
   hampered by
      a. Plaintiff's lack of legal knowledge,
      b. Plaintiff's geographic isolation from the court, and
      c. Plaintiff's lack of membership in the Florida Bar.

231.    These factors greatly have complicated scheduling,
   securing witnesses, conducting discovery, and many other
   facets of the process of litigation.

           Existence of Attorney-Client Relationship

232.    Based on the foregoing, at all times described in the
   above, from December, 2008, until the present, per the
   terms of the 2008 and 2010 contracts, an attorney-client
   relationship existed between Plaintiff and Defendant.

233.    Accordingly, at all times described above, from
   December, 2008, until the present, Defendant has been under
   a professional and a fiduciary duty to Plaintiff consistent
   with the existence of an attorney-client relationship.

Causes of Action

First Cause of Action: Professional Negligence / Legal
Malpractice

234.    Plaintiff refers to and incorporates herein the
General Allegations and the allegations of the preceding
Causes of Action in paragraphs 1 through 233 alleged herein
above, and makes them a part hereof as though set forth at
length.

235.   Based on the foregoing, Defendant was negligent in his
representation of Plaintiff, in that Defendant's actions
repeatedly failed to meet the applicable standard of care
practiced by a reasonable attorney. This negligence
included but was not limited to the following:

236.   Defendant failed to advise Plaintiff that   ex-wife's
failure properly to serve Plaintiff in December, 2013,
meant that Plaintiff was under no legal responsibility to
respond to Plaintiff's ex-wife's original Petition.

237.    Defendant failed to advise Plaintiff that since
Plaintiff's ex-wife's amended petition failed to reassert
the previous frivolous abuse claims and to seek a
restraining order against Plaintiff, these matters were no
longer before the court and required no action on
Plaintiff's part.

238.   Defendant failed to maintain adequate records of his representation of Plaintiff.

239.   Defendant failed adequately to communicate with Plaintiff regarding his representation.

240.   Defendant repeatedly made misrepresentations of material fact to Plaintiff during Defendant's representation of Plaintiff.

241.   Defendant withdrew from Plaintiff's representation at a time and in a manner that was prejudicial to Plaintiff's interests.

242.   Defendant failed adequately to investigate the legal theories upon which Plaintiff's ex-wife's claims were made, the legal theories upon which Plaintiff's defenses and counterclaims could have been based, legal precedent in the state of Colorado, where the initial divorce stipulation was filed, and the ramifications of the domestication of the matter to Florida.

243.   Defendant failed investigate or to discuss with Plaintiff the fact that until the matter was domesticated to Florida, Colorado law, which was more favorable to Plaintiff controlled the action, and that until that point, Plaintiff had recourse to the Colorado courts.

244.   Defendant failed to investigate or to discuss with Plaintiff the ramifications of the joint bank account

referred to above, including legal and ethical means whereby the ownership of said account could be established early in the litigation, in order to prevent any appearance that said funds were the property of Plaintiff.

245.   Defendant failed to investigate or to discuss the likelihood of Plaintiff's prevailing on Plaintiff's desire to become the primary residential parent of his son, given Plaintiff's then current and anticipated financial and living situation.

246.   Defendant failed to conduct adequate discovery regarding the finances of Plaintiff's ex-wife, her trust fund, and the ongoing financial support by Plaintiff's ex-wife's mother.

247.   Defendant failed to conduct an adequate investigation into each of the following matters:

    a. Defendant's, the court appointed psychologist's, and the court appointed social worker's fears that Plaintiff's ex-wife suffered from Munchausen's Disease by Proxy.

    b. Defendant's ex-wife's boyfriend's assault and battery on Plaintiff in the presence of Plaintiff's son, as well as the assailant's history of violence and mental illness.

c. Defendant's ex-wife's boyfriend's son's bullying of Plaintiff's son.

248.   Defendant did not preserve objections for appeal during the May, 2011, hearing.

249.   Defendant agreed to stipulation of the introduction evidence at trial that Defendant knew was false.

250.   Defendant agreed, against Plaintiff's direct instructions, and against Plaintiff's interests, to limit discovery regarding Plaintiff's ex-wife's finances, specifically her mother's ongoing contributions to her finances.

251.   Defendant failed to object to the introduction of evidence regarding Plaintiff's mother's financial support after opposing counsel breached the above agreement.

252.   Defendant insisted that Plaintiff sign a discovery authorization which authorized the production of more information than the court required.

253.   Plaintiff suffered damages as a direct and proximate result of Defendant's failure to meet the applicable standard of care practiced by a reasonable attorney.

Second Cause of Action: Fraud

Fraudulent Inducement

254.   Plaintiff refers to and incorporates herein the

General Allegations and the allegations of the preceding
Causes of Action in paragraphs 1 through 253 alleged herein
above, and makes them a part hereof as though set forth at
length.

255.   Defendant induced Plaintiff to enter into a contract
for Defendant's services in April, 2010, by falsely stating
that if Plaintiff did not engage an attorney at that time,
he likely would never see his son again.

256.   Defendant induced Plaintiff to enter into a contract
for Defendant's services in April, 2010, by falsely stating
that Plaintiff was then in arrears in his payments to
Defendant, when in fact Defendant had been billing
Plaintiff at an incorrect rate for over two years.

257.   This statement was a false statement regarding a
material fact, upon which Plaintiff relied, and which
induced Plaintiff act to his detriment.

258.   Plaintiff suffered damages as a direct and proximate
result of his reliance on Defendant's false statements.

### Fraudulent Performance

259.   Plaintiff refers to and incorporates herein the
General Allegations and the allegations of the preceding
Causes of Action in paragraphs 1 through 258 alleged herein
above, and makes them a part hereof as though set forth at
length.

260.    Defendant, on an ongoing basis, consciously and with
no legitimate purpose performed unnecessary legal services
in order to increase the number of hours he could bill to
Plaintiff.

261.    Defendant, on an ongoing basis, billed Plaintiff for
work that defendant did not actually perform.

262.    Defendant, on an ongoing basis, billed Plaintiff at an
hourly rate in excess to that agreed upon at the time when
Plaintiff engaged Defendant's services.

263.    Defendant, on an ongoing basis, filed numerous motions
with no intent of obtaining a hearing. Defendant billed
Plaintiff for the research, drafting, and filing of these
motions.

264.    Defendant, on an ongoing basis, filed numerous
amendments to motions filed with the court, with the intent
of increasing Plaintiff's legal bills.

265.    Defendant, on an ongoing basis, made representations
to Plaintiff regarding the specifics of Defendant's
representation of Plaintiff, with no intention of complying
with Plaintiff's specific and reasonable requests regarding
same.

266.    Defendant, subsequent to being paid in advance for
legal work, and without discussing his intention or
obtaining Plaintiff's permission, unilaterally limited the

scope of the legal services which Defendant actually
provided to plaintiff.

267.    Defendant fraudulently misrepresented to opposing
counsel and to the guardian ad litem that Defendant had
permission to enter into negotiations and to reach an
agreement on Plaintiff's behalf.

268.    Defendant fraudulently misrepresented to the court
that Defendant was acting with Plaintiff's permission and
authorization when Defendant filed motions with the court
regarding the appointment of a guardian ad litem.

269.    Defendant repeatedly and falsely represented to
Plaintiff that if Plaintiff did not comply with Defendant's
advice or with agreements that Defendant had made without
Plaintiff's informed consent, Plaintiff would "never see
his son again."

270.    Defendant falsely represented to the court that
Defendant had provided Plaintiff with notice of the August,
2011, hearing where Defendant sought to withdraw from
Plaintiff's representation.

271.    Plaintiff suffered damages as a direct and proximate
result of Defendant's fraudulent performance of the two
above referenced contracts.

    Third Cause of Action: Breach of Fiduciary Duty

272.    Plaintiff refers to and incorporates herein the

General Allegations and the allegations of the preceding Causes of Action in paragraphs 1 through 271 alleged herein above, and makes them a part hereof as though set forth at length.

273.   As a result of the attorney-client relationship that existed between Defendant and Plaintiff, Defendant had a fiduciary duty to plaintiff, commensurate with the trust and confidence that Plaintiff reasonably placed in Defendant.

274.   Defendant repeatedly breached this duty of trust and confidence, especially after Defendant accepted a prepayment for legal fees in April, 2010.

275.   This acceptance of a prepayment caused Defendant's and Plaintiff's interests to diverge.

276.   The subsequent breaches include but are not limited to:

   a. Defendant's filing a motion with the court a motion for the appointment of a guardian ad litem, against Plaintiff's express instructions.

   b. Defendant's appearing before the court to request the appointment of a guardian ad litem.

   c. Defendant's entering into an agreement with opposing counsel and the guardian ad litem to settle the issues of a visitation plan against Plaintiff's direct

instructions and on terms which were unfavorable to Plaintiff.

d. Defendant's refusal, after being expressly informed that Plaintiff did not agree with the terms of said settlement of visitation plan, to inform opposing counsel, the guardian ad litem, and the court that Plaintiff had expressly refused to agree to the settlement agreement.

e. Defendant's entering into an agreement to Plaintiff's detriment with opposing counsel to "leave the grandmothers out of" the investigation of both parties' financial situations, without consulting or informing Plaintiff.

f. Defendant's scheduling a mediation with the guardian ad litem and opposing counsel without Plaintiff's knowledge.

g. Defendant's agreeing, allegedly on behalf of Plaintiff, for the ongoing services of the guardian ad litem and for a required court hearing prior to any out of town visitation between Plaintiff and his son subsequent to 9 months after the court's entry of a final order.

h. Defendant's refusal to take actions which he and Plaintiff agreed Defendant would take in Defendant's

representation of Plaintiff, including but not limited
to:

    i.  Investigating Plaintiff's ex-wife's financial
       situation,

   ii.  investigating the circumstances around
       Plaintiff's son's bullying,

 iii.  investigating the circumstances surrounding
       Plaintiff's ex-wife's boyfriend's threats to
       mutilate a man's genitals.

i. Defendant's stipulating to the introduction of
evidence at the May, 2011, which Defendant knew was
inaccurate.

j. Defendant's agreeing with opposing counsel to postpone
the litigation of the issues of attorneys' fees until
a point in time when Defendant knew that he intended
to have formally withdrawn from Plaintiff's
representation.

k. Defendant's failure to bring numerous issues to the
attention of the court prior to his formal withdrawal
from Plaintiff's representation, such issues including
but not limited to:

 iv.  Makeup visitation,

  v.  Change in primary parent,

      vi. Issues of Plaintiff's son's safety due to the
likely mental illness of Plaintiff's son's
mother, and

    vii. Numerous breaches of the Colorado stipulation by
Plaintiff's ex-wife.

277. Defendant's withdrawal from Plaintiff's representation
prior to the resolution of all matters pending before the
court.

278. Plaintiff suffered damaged as a direct and proximate
result of Defendant's numerous breaches of his fiduciary
duties to Plaintiff

Fourth Cause of Action: Breach of Contract

279. Plaintiff refers to and incorporates herein the
General Allegations and the allegations of the preceding
Causes of Action in paragraphs 1 through 278 alleged herein
above, and makes them a part hereof as though set forth at
length.

280. Two contracts were entered into between Plaintiff and
Defendant, one in December, 2008, and one in April, 2010.

281. Defendant materially breached each of these contracts.

282. Plaintiff suffered damages as a proximate result of
Defendant's material breach of these two contracts.

283.    These breaches included but were not limited to the
following:

    1. Defendant billed Plaintiff at a rate greater than that
specified in the December, 2008, contract, on an
ongoing basis.

284.    Defendant withdrew from representing Plaintiff prior
to his satisfaction of the terms of the 2010 contract.

285.    Defendant entered into binding agreements with
opposing counsel either without consulting Plaintiff or in
direct contravention to Plaintiff's direct instructions, in
violation of the contractual relationship between the
parties.

286.    Plaintiff suffered damages as a direct and proximate
result of Defendant's multiple breaches of his fiduciary
duties to Plaintiff.


287.    All negligence, fraud, and Breach of Fiduciary duty
was also a breach of contract.

Fifth Cause of Action:

Intentional Infliction of Emotional Distress

288.       Plaintiff refers to and incorporates herein the
General Allegations and the allegations of the preceding
Causes of Action in paragraphs 1 through 287 alleged herein

above, and makes them a part hereof as though set forth at
length.

289.     Plaintiff refers to and incorporates herein the
General Allegations and the allegations of the preceding
Causes of Action in paragraphs 1 through 279 alleged herein
above, and makes them a part hereof as though set forth at
length.

290.     Based on the foregoing, Defendant's behavior toward
Plaintiff, especially but not limited to Defendant's
repeated statements that Plaintiff would never see his son
again, his refusal to communicate with Plaintiff, his
withdrawal from Plaintiff's representation, his entering
into an agreement and presenting same to the court despite
Plaintiff's express instructions not to, and his
representations that led Plaintiff to forego seeking
medical attention for Plaintiff's mother and therefore led
Plaintiff to witness his mother suffer a stroke were:

291.   Intentional or reckless and

292.   outrageous,

293.   This conduct caused emotional distress, and

294.   The emotional distress was severe.

295.   Plaintiff suffered damages as a direct and proximate
result of Defendant's intentional infliction of emotional
distress on Plaintiff.

### Demand for Relief

296.    Plaintiff hereby demands relief as regards each of the
   above causes of action, as follows:

297.  For actual damages according to proof;

298.  For exemplary damages according to proof;

299.  For interest as allowed by law;

300.  For costs of suit incurred herein; and

301.    For such other and further relief as the Court deems
   just and appropriate.

### Demand for Punitive Damages

302.    Defendant's actions, as to each of the above causes of
   actions were such that, per Florida Statutes §§ 768.72, et.
   seq., Defendant may be held liable for punitive damages,
   because Defendant was personally guilty of intentional
   misconduct or gross negligence.

303.    Plaintiff hereby requests leave of this court to plead
   punitive damages.

304.    Plaintiff hereby requests that, should this court not
   find the foregoing to be an adequate basis to allow

Plaintiff to plead punitive damages, that this court allow

Plaintiff to demonstrate such basis through a proffer to

this court, upon reasonable notice to Plaintiff and

Defendant.

Demand for Jury Trial

305.    Jury trial demanded.

Dated this the 16th day of April, 2014.

Alton Earl Ingram

299 Piedmont Avenue #764

Berkeley, CA 94720

altoningram@yahoo.com

Telephone: (510)705-2343

Facsimile: (877)500-7953

In Proper Person



Exhibit List:


Exhibit A: December, 2008 Contract

Exhibit B: April, 2010 Contract

EXHIBIT A: December, 2008 Contract

## CONTRACT OF EMPLOYMENT

STEPHEN H. BUTTER, P.A. and ALTON INGRAM agree as follows:

1. **RETAINER FEE AND HOURLY RATE:** Client retains Stephen H. Butter, P.A. and shall pay him a non-refundable engagement and retainer which is considered earned by the attorney upon receipt pursuant to the Professional Ethics of Florida Bar Opinion 93-2 and Florida Bar Journal/April 1999 article. The nonrefundable engagement and retainer shall be $5,000. The fee for representation shall be $360 per hour and expenses such as court reporter expenses, etc. all of which will be billed and paid monthly. The balance due on all fees and expenses shall be paid in full at least five days prior to the final hearing.

2. **CO-OPERATION:** Client agrees that if the fees and court costs are not paid in full and on time or if client does not cooperate regarding reasonable request such as timely completing affidavits, answers to interrogatories, and producing documents that Stephen H. Butter, P.A. can withdraw.

3. **NO REPRESENTATION AS TO TOTAL FEE:** Client agrees that it is impossible to determine in advance the amount of time that will be needed to complete the legal services required and therefore determine in advance the total attorney's fees.

4. **NO TAX ADVICE:** Stephen H. Butter, P.A. shall not be rendering tax opinions or advice upon which client should rely. Client agrees to retain his or her own accountant regarding any and all of the tax aspects of this case, settlement agreements, drafting of qualified domestic relations orders, and/or court orders.

5. **INTEREST:** Interest shall accrue at a rate of 10% on all delinquent payments not timely made pursuant to this contract. QUALITY ENGINEERED INSTALLATION, INC. VS. HEGLEY SOUTH, INC., 670 So.2d 929 (Fla. 1996).

6. **CHARGING LIEN:** To secure the attorney's fees it is agreed that Stephen H. Butter, P.A. shall have a charging lien on any and all personal property and real property that may be the subject matter on your case. In Rex Donovan, 6 FLW Fed. B31 (Bankr. S.D. Fla., February 28, 1992), NEW ENGLAND LIFE INSURANCE CO., VS. PODHURST, 22 FLW

Turnberry Plaza, 2875 N.E. 191st Street · PH 2A, Aventura, FL 33180, (305) 936-1901 DADE, (954) 761-7116 BROWARD, (305) 933-1616 TELEFAX, shbutter@bellsouth.net E-MAIL

## CONTRACT OF EMPLOYMENT

STEPHEN H. BUTTER, P.A. and ALTON INGRAM agree as follows:

1.   RETAINER FEE AND HOURLY RATE:  Client retains Stephen H. Butter, P.A. and shall pay him a non-refundable engagement and retainer which is considered earned by the attorney upon receipt pursuant to the Professional Ethics of Florida Bar Opinion 93-2 and Florida Bar Journal/April 1999 article. The nonrefundable engagement and retainer shall be $5,000.  The fee for representation shall be $360 per hour and expenses such as court reporter expenses, etc. all of which will be billed and paid monthly.  The balance due on all fees and expenses shall be paid in full at least five days prior to the final hearing.

2.   CO-OPERATION:  Client agrees that if the fees and court costs are not paid in full and on time or if client does not cooperate regarding reasonable request such as timely completing affidavits, answers to interrogatories, and producing documents that Stephen H. Butter, P.A. can withdraw.

3.   NO REPRESENTATION AS TO TOTAL FEE:  Client agrees that it is impossible to determine in advance the amount of time that will be needed to complete the legal services required and therefore determine in advance the total attorney's fees.

4.   NO TAX ADVICE:  Stephen H. Butter, P.A. shall not be rendering tax opinions or advice upon which client should rely.  Client agrees to retain his or her own accountant regarding any and all of the tax aspects of this case, settlement agreements, drafting of qualified domestic relations orders, and/or court orders.

5.   INTEREST:  Interest shall accrue at a rate of 10% on all delinquent payments not timely made pursuant to this contract. QUALITY ENGINEERED INSTALLATION, INC. VS. HEGLEY SOUTH, INC., 670 So.2d 929 (Fla. 1996).

6.   CHARGING LIEN:  To secure the attorney's fees it is agreed that Stephen H. Butter, P.A. shall have a charging lien on any and all personal property and real property that may be the subject matter on your case. In Re: Donovan, 6 FLW Fed. B31 (Bankr. S.D. Fla., February 28, 1992), NEW ENGLAND LIFE INSURANCE CO., VS. PODHURST, 22 FLW

Page   2

D787 (3rd D.C.A. March 1997); MILES VS. KATZ, 405 So.2d 750 (4th D.C.A. 1981), LEVY VS. LEVY, 483 So.2d 455 (3rd D.C.A. 1986), BOSEM VS. BOSEM, 279 So.2d 863 (Fla. 1973), WISHOFF VS. WISHOFF, 497 So.2d 1351 (4th D.C.A. 1986), SINCLAIR, LOUIS, SIEGEL, HEATH, NUSSBAUM AND ZAVERTNIK, P.A. VS. BAUCOM, 428 So.2d 1383 (Fla. 1983), DANIEL MONES, P.A. VS. SMITH, 486 So.2d 559 (Fla. 1986) and VASQUEZ VS. VASQUEZ, 512 So.2d 1045 (3rd D.C.A. 1987).

7.      NO GUARANTEES:  Stephen H. Butter, P.A. has made no representation nor guarantees concerning the outcome of this case.

8.      TRAVEL TIME:  The client specifically wants to retain Stephen H. Butter, P.A. rather than any other lawyer. Client acknowledges that client is able to afford travel time to and from  depositions, court hearings, and conferences from Turberry Plaza. WRIGHT VS. WRIGHT, 577 So.2d 1355 (1st D.C.A.1991), review dismissed, 587 So.2d 1331 (Fla. 1991); BROCK VS. BROCK, 654 So.2d 163 (1st D.C.A. 1995).

9.      ENTIRE AGREEMENT:  This contract of employment contains the entire understanding between Stephen H. Butter, P.A. and client.

10.     REVIEW OF MONTHLY STATEMENTS:  Client shall review our monthly statements upon receipt and that if client has a dispute with or questions regarding any charges, client shall notify us in writing within ten days from the date of the statements. We encourage your monthly review. FRANKLIN & MARBIN, P.A. VS. MASCOLA, 711 So.2d 46 (4th D.C.A. 1998).

11.     RETAINING LIEN:  Stephen H. Butter, P.A. shall have a retaining lien on client's files but they shall be released to client upon payment of all sums due pursuant to this contract.  HALL AND ASSOCIATES VS. GHANEM, ET AL, 679 So.2d 60 (4th D.C.A. 1996); WINTER VS. FABBER, 618 So.2d 375 (4th D.C.A. 1993).

12.     WAIVER OF HOMESTEAD:  As to the homestead provision of the Florida Constitution or any statute or Florida Statute 222.01, and 222.02 client releases any

Turberry Plaza, 2875 N.E. (91st Street - PH 2A, Aventura, FL 33180, (305) 936-1301 DADE, (954) 761-7116 BROWARD, (305) 933-1615 TEL/FAX, shbutter@bellsouth.net E-MAIL.

Page   3

homestead claim, demand, right or interest that the client may have or acquire in any real property. The waiver of homestead is specifically to allow the imposition of a charging lien on my homestead property which means that the fees due Stephen H. Butter, P.A. shall be paid upon refinancing of the homestead, sale of the homestead, or foreclosure because of the failure to pay the amount due Stephen H. Butter, P.A. The legal description of my homestead is as follows:

SEE ATTACHED

13.   REVIEW OF CONTRACT: Before signing I have read the contract carefully and understand all of the contents. If there was anything I did not understand I asked about it and was given the opportunity to have this agreement reviewed by any other lawyer or person of my choice.

14.   PAYMENT FROM OPPOSING PARTY AND NO CREDIT TO CLIENT:  The total fee will be based upon the standards established by the Florida Bar Association and the Florida courts.  This total amount, which may be over and above the hourly rate and retainer fee charged pursuant to this contract, is not the responsibility of client.  However, Stephen H. Butter, P.A. wants the client to realize that he will be seeking an award of fees from the client's spouse or ex-spouse.  The court may not or may award an attorney's fee and court costs or the client's spouse or ex-spouse may not or may agree to pay a fee and costs.  The client understands that if said fee and costs agreed to by client's spouse or ex-spouse or awarded by the court, is paid by client's spouse, or ex-spouse said funds are to be retained by Stephen H. Butter, P.A. There shall be no reimbursement or credit to client's fee or any fees recovered from client's spouse or ex-spouse because Stephen H. Butter, P.A. has reduced its normal retainer fee and hourly rate.  Florida Bar Staff Opinion 87319.

15.   FEE FOR COLLECTING FEE AGAINST CLIENT: In the event it is necessary to file a motion to establish a charging lien, file a  motion to determine the amount of fees

Turnberry Plaza, 2875 N.E. 191st Street - PH 2A, Aventura, FL 33180, (305) 936-1943  DADE,  (954) 761-7116  BROWARD,  (305) 932-1515 TELEFAX,  sbbutter@bellsouth.net E-MAIL

Page   4

owed, institute any type of suit or other action for the entitlement to a fee or the establishment of the amount or collection of the fees, client agrees to pay all costs, expenses, and additional lawyers fees necessitated thereby.  BERRYER V.S. HERTZ, 522 So.2d 510 (3rd D.C.A. 1988).

16.     DISCARD FILES: Pursuant to Florida Bar Opinion 81-8 a lawyer who intends to dispose of client's files should make a diligent attempt to contacts the client and determine their wishes concerning their files.  By signing this contract of employment client acknowledges and authorizes the file to be destroyed when representation has been completed. Client acknowledges that client will be receiving a copy of everything in the client's file from time to time as the work is completed. Pursuant to the Fair and Accurate Credit Transaction Act and to reduce the risk of fraud and identity theft the federal rule requires businesses to take appropriate measures when disposing of files.   Client acknowledges that files will be destroyed pursuant to reasonable measures upon the conclusion of the representation which may include shredding all of the papers so that they cannot be read or reconstructed.

DATED the _7_ day of _Dec._ 2008.

_____
ALTON INGRAM

I HEREBY ACCEPT the responsibility to represent the above client and the terms of this contract of employment.

_____
STEPHEN H. BUTTER, P.A.

EXHIBIT B: April, 2010 Contract

Alton Ingram

330 West Fort Morgan Road #2a

Gulf Shores, AL 36542

April 27, 2010

TO: Steven H. Butter
TURNBERRY PLAZA PENTHOUSE
2875 NORTHEAST 191 STREET
AVENTURA FLORIDA 33180

Mr. Butter,

As I was unable to arrange for the wire transfer you equested, I am sending this letter and the
enclosed copy of the confirmation notice from Wells Fargo, so you know that I have arranged for
payment of the $40,000 you requested in order to continue working on my case until all matters
regarding the post dissolution proceedings have reached a final solution. (The bank confirmation
has also been sent via email.)

As we discussed, this new agreement voids our old contract and covers all professional fees for
your time and routine office expenses only, until all matters surrounding my Colorado divorce
are finally disposed of. It will not cover costs such as court reporters and the like, which I hereby
authorize you to hire on my behalf.

Specifically, as we discussed, and in contrast to the letter which I received via email from your
office, this agreement does not place any time limit on your representation. Although I hope that
you will be able to resolve matters soon, as we discussed, I cannot pay one penny more in legal
fees before this is totally over with, so I cannot enter into an agreement that may leave me
without representation before all matters are resolved, especially given Mr. Strolberg's delaying
tactics and what you have described as a packed court schedule.

I appreciate your agreeing to continue to represent me. Thank you.

Sincerely,

Alton Ingram

Please call me once check arrives.
Thanks!

4/26/2010                                    Payment

                                    Sign Off | Home | Locations | Contact Us | Online Security Guarantee

**Wells Fargo Business Online®**

Accounts   Transfers & Payments   Brokerage   Account Services   Messages & Alerts   Online Solutions
                                    Open an Account

Overview   Bill Pay   Transfers   Tax Payments

Bill Pay Overview | Payments | Payees | eBills | Reports   Notices | User Profile

                                                          ? Help

| | |
|---|---|
| Unviewed Notices | (0) |
| Unpaid eBills | (0) |
| Pending Payments | (1) |

## Payment Confirmation

You have successfully made the following payment(s). You can edit or cancel pending payments, but not processed payments.

**XXXXXX8363 CHECKING**

**PENDING PAYMENTS**

| Payee | Reference # | Send On | Expected Delivery | Amount |
|---|---|---|---|---|
| Stephen H. Butto | Q8SBQZMl | 04/26/2010 | 05/03/2010 | $40,000.00 |
| | | | Total (1): | $40,000.00 |

Note: Payments can be scheduled for Monday-Friday, excluding holidays. To make or change payments scheduled for today, you must submit your request before 7:00 p.m. Pacific Time.

To Overview

**Payment Account(s)**

**Checking Accounts**
CHECKING XXXXXX8363
Avail. Balance:   $48,488.88
Sched. Payments: -$40,000.00
Projected (05/03):  $8,488.88

**Credit Accounts**
VISA XXXX-XXXX-XXXX-4837
Avail. Credit:   $12,693.00

**Personal Line of Credit**
Apply Now

**Home Equity Line**
Apply Now

* Estimate based on your current available balance or credit less any scheduled Bill Pay payments through 05/03/2010.

**Other Services**
Overdraft Protection

**Payments Help**

Learn more about:
Payment Account(s) Section

Bill Pay Overview | Payments | Payees | eBills | Reports | Notices | User Profile
Overview | Bill Pay | Transfers | Tax Payments
Accounts | Transfers & Payments | Brokerage | Account Services | Messages & Alerts | Online Solutions | Open an Account

Home | Locations | Contact Us | Privacy, Security & Legal | Sign Off
Equal Housing Lender
© 2001-2010 Wells Fargo. All rights reserved.

billpay.wellsfargo.com/.../MakePayment                              1/1